UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH TORRES,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF OAKLAND, et al.,<br><br>        Defendants. | Case No.  15-cv-05075-JCS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 49 |

## I.      INTRODUCTION

Plaintiff Joseph Torres is a Captain in the Oakland Fire Department ("OFD"), where he has served as a firefighter for 25 years.  In this action, he alleges that Defendants discriminated against him on the basis of race and national origin when they failed to promote him to the position of battalion chief after he passed the battalion chief exam and was placed on an eligibility list for that position.   Defendants bring a Motion for Summary Judgment ("Motion") seeking judgment in their favor on all claims on the basis that there is no evidence that Defendants acted with a discriminatory motive or intent.  A hearing on the Motion was held on September 8, 2017. For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[1]

## II.      BACKGROUND

### A.      Factual Background

#### 1.  The OFD Command Structure

The OFD command structure consists of the Chief, two deputy chiefs and twelve battalion chiefs.  Robertson  Decl. ¶ 5.  Below the battalion chiefs, in order of rank, are captains,

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

lieutenants, and firefighters. *Id.* While OFD also has "non-sworn" staff, all of the positions listed above are "sworn" positions. Walsh Decl. ¶ 3. Between 2012 and 2016, there were slightly over 400 people holding these sworn positions in OFD in any given year. Walsh Decl., Ex. F. The current Chief is Teresa Deloach Reed ("Chief Reed"), who was appointed to the position in 2012. Reed Decl. ¶ 1.

Promotions (other than to the Chief position) for sworn positions are governed by the Memorandum of Understanding ("MOU") with the union that represents OFD firefighters, the International Association of Firefighters Local 55 ("Local 55"). Walsh Decl. ¶ 4. When one of these positions becomes vacant, the Chief has discretion to decide whether she wants to fill it. Walsh Decl. ¶ 5. If she decides to fill the position, Human Resources will announce a promotional exam. *Id.* The battalion chief promotion process involves two steps; first candidates takes the promotion exam and are placed on an eligibility list if they achieve a score above a certain minimum. *Id.* ¶ 7. Second, the candidates on the eligibility list are interviewed by an OFD panel and the Chief. *Id.* ¶ 8. Although the candidates are ranked according to their score on the eligibility list, the Chief is not required to promote the candidates based on the rankings. *Id.* ¶ 8. The City Administrator must approve the promotion before it takes effect. *Id.* ¶ 9.

Typically, when there is a deputy chief vacancy, a battalion chief from within OFD is promoted to that position. *See* Robertson Decl. ¶ 8 (stating that in the 27 years he has been a firefighter with OFD all deputy chiefs have been hired internally from the ranks of OFD battalion chiefs). Similarly, when there is a battalion chief vacancy (for either a permanent position or a Limited Duration Appointment ("LDA")), it is typically filled internally by a captain who has passed the battalion chief test and has been placed on a battalion chief eligibility list. Walsh Decl. ¶¶ 6-9.

### 2. Hispanics in OFD

Defendants have provided statistics reflecting the race and national origin of OFD sworn staff, broken down by rank, for the years 2012-2016. Walsh Decl., Ex. F. Torres does not challenge the accuracy of these statistics. They reflect that between 2012 and 2016, there were no Hispanics in OFD above the level of captain. *Id.* The overall percentage of Hispanics in OFD

during this period was between 16% and 19%, with all of these individuals in the positions of firefighter, lieutenant or captain. *Id.*[2]

### 3. The 2012 Battalion Eligibility List

OFD established a battalion chief eligibility list in 2012 ("the Eligibility List"). Walsh Decl. ¶ 11. The Eligibility List was active for two years, from November 16, 2012 to November 16, 2014. Verschagin Decl., Ex. D (Eligibility List). The list included four captains, whose ranks and scores were as follows: 1) James Bowran (89.63); 2) Geoffrey Hunter (89.16); 3) Joseph Torres (87.02); and 4) Coy Justice (78.90). Torres was the only Hispanic on the list. Verschagin Decl., Ex. B (Reed Dep.) at 85. It is undisputed that Chief Reed knew that Torres was Hispanic at all times relevant to this lawsuit. *See* Verschagin Decl., Ex. A (Torres Dep.) at 114 (testifying that at March 27, 2013 interview Torres told Chief Reed about his background, including his Native American and Hispanic origin).[3]

There were two battalion chief vacancies in 2013. Walsh Decl. ¶ 13. On March 27, 2013, the four candidates interviewed for those two vacancies. Vereschagin Dec. Ex. E (interview schedule). The candidates were interviewed individually by Chief Reed, and also by a four-person panel consisting of OFD Deputy Chief Mark Hoffman, former OFD battalion chief Darin White, OFD battalion chief Lisa Baker and former OFD battalion chief Eamon Usher. Jefferson Decl., Ex. B (Torres Dep.) at 96. Chief Reed promoted Captains Bowran and Justice to the two battalion chief positions. Walsh Decl. ¶ 13. She testified at her deposition that all four candidates were considered equal going into the interviews. Jefferson Decl., Ex. A (Reed Dep.) at 39. She further testified that she felt that "[Justice] was the best person at that time" and that she "liked how he presented himself during his interviews." *Id*. at 38-39. According to Chief Reed, she

---

[2] Torres also asks the Court to take judicial notice of demographic statistics from the United States Census Bureau and the City of Oakland website related to the racial make-up of Oakland's population. *See* Request for Judicial Notice, Docket No. 52 ("RJN") ¶¶ 1-2, Exs. A & B. The Court SUSTAINS Defendants' objections to these statistics. *See* Docket No. 56-2. As the undisputed evidence shows that battalion chiefs are promoted from within OFD, the relevant applicant pool for the purposes of determining discriminatory intent is not the general population. Therefore, Torres has not demonstrated the relevance of these statistics under Rule 401(b) of the Federal Rules of Evidence.
[3] At oral argument, Torres stipulated that his discrimination and retaliation claims are not based on his Native American heritage.

"talked to the panel about all the candidates" and they agreed that Justice should be promoted rather than Torres. *Id.* at 40. Similarly, Chief Reed testified that Bowran "presented himself well" at the interviews and . . . seemed like a good candidate." *Id.* Chief Reed did not recall if any of the panelists recommended that Torres be promoted over Justice but testified that "everyone felt that the interview was solid and Coy had a solid reputation as a leader within the organization." *Id.*

In contrast, in a declaration submitted in support of Torres's Opposition, Usher describes Torres's performance in the March 27, 2013 as "extremely impressive" and "far superior to that of every other candidate." Usher Decl. ¶ 11. He further opined that Torres was "by far the most experienced and qualified candidate for Battalion Chief" and that Bowran and Torres should have been promoted first off the Eligibility List." *Id.* ¶ 13. Usher stated that Justice "performed marginally" in the March 2013 interview with the panel, and that he was "not a respected leader in the OFD." *Id.* ¶ 8. He stated that Bowran's interview performance was "good, but not great." *Id.* ¶ 9. According to Usher, Hunter's interview "presentation appeared scripted" and he offered "canned answers" and spoke "in platitudes." *Id.* ¶ 5. Usher opined that Hunter "did not share any ideas that demonstrated his readiness for appointment to Battalion Chief." *Id.*

Torres testified at his deposition that at the time of the March 2013 interview he did not feel that race came into play in the interview or that Chief Reed used race against him. Jefferson Decl., Ex. B (Torres Dep.) at 113-114, 133. Torres further testified that at the time Bowran and Justice were promoted he didn't think race played a role in Chief Reed's decision not to promote him, though he didn't think the promotion was fair because he believed he was "more qualified" and did not understand "the criteria [Chief Reed] was using." *Id.* at 119-120,132. Torres testified that in hindsight, he concluded that race played a role in the decision. *Id.*

In March 2014, Chief Reed made an LDA battalion chief appointment, selecting Hunter for that position rather than Torres. Walsh Decl. ¶ 14. LDA appointments are discretionary but if made, must be made from an eligibility list if one is active. *Id.* Therefore, the Chief was required to select either Hunter or Torres for this appointment; she was not required to make this LDA appointment based on rank on the eligibility list though Hunter was, in fact, ranked above Torres.

4

*Id.* No additional interviews were conducted in connection with this appointment.

In March 2014, there were two battalion chiefs who were out due to long-term injury and a third battalion chief went out on long-term injury as of April 2014. Usher Decl. ¶ 17. Consequently, there were two battalion chief positions for which LDA appointments could have been made as of March 2013 and as of April 2014 there were three such positions. *Id.* One of those LDA positions became a permanent opening in August 2014, when battalion chief William Towner retired. *Id.* According to Local 55 vice president Zac Unger, the union recommended that Chief Reed promote both Hunter and Torres to LDA battalion chief positions, but she "didn't take [the union's] recommendations to heart" and instead staffed the other vacant battalion chief positions through "rotating overtime." Verschagin Decl., Ex. C (Unger Dep.) at 18-19. Unger testified that he believed that this approach created a "public safety issue" because the battalion chiefs who filled these positions were "overworked and overtired" and the crews worked less effectively because they were working with different battalion chiefs rather than developing a "steady" relationship with a single battalion chief. *Id.* at 18.

### 4. Selection of Hunter for Permanent Battalion Chief Position in October 2014

In October 2014 there was another battalion chief vacancy, this time for a permanent position.[4] Walsh Decl. ¶ 15. The two remaining candidates on the Eligibility List, Hunter and Torres, interviewed for this position on October 10, 2014. Kozak Decl., Ex. M (Interview Schedule). Each candidate was interviewed jointly by Chief Reed, OFD Deputy Chief Mark Hoffman and former OFD battalion chief Darin White. *Id.*; Jefferson Decl., Ex. B (Torres Dep.) at 169-170. Chief Reed testified at her deposition that during Torres's interview he "spoke a lot about the lack of leadership within the organization." Jefferson Decl., Ex. A (Reed Dep.) at 91 ("it appeared that every question he answered, he talked about the lack of leadership, where it got to the point that he was getting ready to answer a question, and I said, do not say lack of leadership."). Chief Reed testified that she was "very disappointed" by Torres's interview performance as she was "actually really rooting" for Torres. Jefferson Decl., Ex. A (Reed Dep.)

---

[4] Presumably, this opening was created when battalion chief Towner retired in August 2014.

at 96. As to Hunter, Chief Reed testified that she recalled that he gave "a really strong interview." *Id.* at 89.

Torres does not dispute that he discussed leadership in his interview but contends he did not challenge Chief Reed's leadership and that his statements about leadership were about "pushing [Chief Reed's] agenda." Jefferson Decl., Ex. B (Torres Dep.) at 179-180. He contends the notes of the panelists do not back up Chief Reed's assertion that he said anything that amounted to a challenge to her leadership during that interview. *See* Opposition at 12 (citing Kozak Decl., Ex. N (interview notes)). Chief Reed's notes[5] include the following references to leadership: "skill sets to be a leader"; "Crews want leadership"; "Capt LT wants leadership, integrity, command presence"; "will be a leader keeps folks safe"; "leadership – moral, communication"; "Judge on totality of what he has done – been leader, successful, leadership skills". *Id.* at OCA 002673-002675. Another panel member's notes about Torres include the following references to leadership: "Talks of people, members, crews – asks what they want in a chief. 'They want leadership.' . . .They want BC's they can believe in"; "Has the skill sets necessary – command presence . . . , teacher, mentor, leader"; "people will know he is a leader and has integrity"; "Leadership – X – it affects morale, communication . . ." "Leads have to have expectations – w/out it everything crumbles – won't believe in you. W/out it nothing gets done"; "leadership flows[6] into everything we do"; "<u>Judge on totality of what he has accomplished</u> done as a leader in the dept." "knows what it takes to be a leader"; "leader at home w/family, community + in the department." *Id* at OCA 002681- 002685.

The timing of some of the relevant events that followed the October 10, 2014 interviews appears to be disputed but for the purposes of the instant motion the parties have agreed on certain basic facts. First, within a few days of the interview, Chief Reed spoke to Torres and told him she was leaning away from hiring him for the battalion chief position. Verschagin Decl., Ex. A

---

[5] The notes provided in Kozak Decl., Ex. N do not identify the specific authors of the notes. It appears to be undisputed that OCA 002673-002675 were taken by Chief Reed.
[6] Defendants transcribe this word as "flaws" in their brief. *See* Reply at 6. While the handwriting is somewhat difficult to read, the Court concludes that the most natural reading of this word is "flows," which fits the sentence grammatically.

United States District Court
Northern District of California

(Torres Dep.) at 193-196. Torres told her to "talk to each and every Battalion Chief and ask them what they [thought] of [him]." *Id.* at 196; Reed Decl. ¶ 5 ("I consulted with two OFD members specifically because Captain Torres urged me to do so before making a promotion decision."). Chief Reed than called Captain Demond Simmons and battalion chief Usher to ask their opinions of Torres, speaking to both between October 10 and 13. Reed Decl. ¶¶ 6-8. Chief Reed testified that she spoke to Demond Simmons, who was a captain, because he worked closely with Torres on a Professional Development Committee. Jefferson Decl., Ex. A (Reed Dep.) at 159-160. According to Chief Reed, she did "not receive unequivocal support for Captain Torres from Captain Simmons or Battalion Chief Usher." Reed Decl. ¶ 13.[7]

Usher states in his declaration that he received a telephone call from Chief Reed on October 13, 2014 and told her that his choice as between Torres and Hunter for the battalion chief position was Torres and that he supported his opinion "by detailing his vast experience and excellent qualifications." Usher Decl. ¶ 16. According to Usher, he also told Chief Reed in this conversation that Torres was "the person who was needed on the streets." *Id.* Similarly, Chief Reed states in her declaration that Usher "spoke highly of Captain Torres" in this telephone conversation. Reed Decl. ¶ 7.

On October 13, 2014, Usher sent Chief Reed a text message stating as follows: "Sit on your BC decision for a bit. Tough one. I still lean JT. All depends what you need on the street. My 2 cents." Reed Decl., Ex. A. Chief Reed states in her declaration that she interpreted this message "as him hesitating on whether I should promote Captain Torres to . . . battalion chief." Reed Decl. ¶ 10. Usher, on the other hand, states in his declaration that his text was referencing his previous statement that "Torres was what was needed on the streets." Usher Decl. ¶ 16.

---

[7] With respect Simmons, Torres asks the Court to take judicial notice of a request for domestic violence restraining order against him dated April 22, 2013. RJN ¶ 3 & Ex. C. The Court SUSTAINS Defendants' objection to Torres's request. Although Chief Reed testified she was aware of the restraining order, *see* Verschagin Decl., Ex. B (Reed Dep.) at 136, she testified that she was not aware of a domestic violence charge against Simmons and did "not know the details of it." *Id.* The details of the domestic violence charge are unclear and this evidence has minimal (if any) relevance to whether Chief Reed acted with discriminatory intent. In any event, any possible relevance is outweighed by the prejudicial nature of this evidence. Therefore, the Court finds that this evidence is inadmissible under Rule 403 of the Federal Rules of Evidence.

On October 22, 2014, Torres and Chief Reed had a conversation ("the October 22 Conversation") in which Torres raised the issue of Hispanic representation within the upper echelons of OFD. *See* Motion at 17; Opposition at 12-13. Although Defendants contend Torres's description of the conversation is inaccurate and they do not necessarily agree that the conversation occurred on October 22, they have stipulated for the purposes of the instant motion that the conversation occurred on that date and that Chief Reed said that OFD had "enough" Hispanics in it and that representation of Hispanics in the battalion chief ranks of OFD was "unimportant." Reply at 5.

Torres's account of the October 22 Conversation is as follows. Chief Reed called him to give him the "heads up" that she was "leaning towards Geoff Hunter." Verschagin Decl., Ex. A (Torres Dep.) at 176. Torres asked her why she did not want to promote him and she "didn't really have an answer" so he "prompted" her, asking her about his various skills. *Id.* at 177-178. Chief Reed then told Torres that he "spoke about leadership" during his interview and that she "took that personally." *Id.* at 179. Torres responded by asking Chief Reed "what [he] could . . . possibly have said about leadership that would offend [Chief Reed]" given that he was "pushing [her] agenda and leadership and [he] was promoting [his] Professional Development Program," which was Chief Reed's program. *Id.* According to Torres, Chief Reed then responded that he may have been "subconsciously" challenging her leadership, which made "no sense" to Torres. *Id.* at 180. Torres says he then asked "what is really going on here?" and why he had not been promoted initially in 2013 or to one of the LDA positions. *Id.* He told her she should hire him because he was "the most qualified person on that list and [she] should be hiring [him] as a reflection of the community." *Id.* at 181. Torres says he stated that "[y]ou have no Hispanic battalion chiefs. The Department's never had Hispanics in the ranks above that, and you have very few Hispanics that are Captains or Hispanics." *Id.* Torres says that Chief Reed responded by stating that "that's unimportant" and that OFD "[has] enough Hispanics in our promoted ranks." *Id.* Torres says he told Chief Reed he disagreed with her and that OFD "did not have enough" Hispanics. *Id.* at 182. He also told her he was "totally offended" by what she had said and that it was "obvious" that Chief Reed had not promoted him because of his race. *Id.* at 183. He told

8

1  Chief Reed that if she did not "do the right thing" he was going to "pursue [his] rights." *Id*. at

2  185.

3      Chief Reed acknowledges that in a conversation with Torres (presumably the October 22

4  Conversation), Torres told her that he had not been criticizing her leadership but rather the

5  leadership of certain battalion chiefs. Jefferson Decl., Ex. A (Reed Dep.) at 132-133. According

6  to Chief Reed, this explanation raised further concerns about Torre's ability to "collaborate and

7  work together" with other battalion chiefs. *Id.*

8      Chief Reed spoke with Torres again on October 23, 2014, at a firefighter memorial.

9  Jefferson Decl., Ex. A (Reed Dep.) at 167. According to Torres, he told Chief Reed that what she

10 had said to him the day before was "totally wrong." Verschagin Decl., Ex. A (Torres Dep.) at 193.

11 Chief Reed, in turn, says she told Torres that the people she had talked to about him were "not

12 saying what [Torres thought they were] saying about [him]." Jefferson Decl., Ex. A (Reed Dep.)

13 at 169. Chief Reed remembers Torres telling her that "the community [was] coming and sharing

14 concerns [with him] that there's no Hispanics in the upper ranks." *Id*. She also recalls telling him

15 he should prepare to take the next battalion chief examination. *Id.* Torres's handwritten notes

16 describing this conversation reflect that Chief Reed told him at the outset of the conversation that

17 she was "not going to hire [him]" but that at the end of the conversation she told Torres she had

18 not decided who she was going to promote to the battalion chief position. Jefferson Decl., Ex. J.

19     Chief Reed, however, states in her declaration that she made her decision to hire Hunter no

20 later than October 17, 2014. Reed Decl. ¶ 14. As evidence that the decision had already been

21 made at the time of the two conversations with Torres discussed above, Defendants offer an email

22 chain dated October 17, 2014 and an email dated October 20, 2014. Reed Decl., Exs. B & C. The

23 October 17 email chain carries the subject line "BC promotion" and starts with an inquiry from

24 executive assistant Rebecca Kozak asking Chief Reed if she needed to send a "personnel file or

25 files to City Administrator before you make promotions?" *Id*., Ex. B. Chief Reed responded, "We

26 do. The names are Joseph Torres and Geoff Hunter. We will job offer Hunter. Let's do that

27 today." *Id*. The second email, sent on October 20, 2014, carries the subject line "Request for

28 Approval to Make Promotion Offer" and states on behalf of Chief Reed that "[t]his email serves as

9

the Fire Chief's request for final approval to make a promotional offer to Captain of Fire Geoffrey Hunter." *Id.*, Ex. C.

The City Administrator approved the appointment of Hunter on October 21, 2014. Reed Decl., Ex. C at OCA 002097 (email notifying Chief Reed that Hunter's promotion had been approved); Walsh Reply Decl. ¶ 11. According to Kip Walsh, a Human Resources Manager for the City of Oakland who directs and manages all recruitment and testing conducted by the City of Oakland, after the City Administrator approves an appointment, a Personnel Action Record ("PAR") is initiated in NEOGOV, the City's internal tracking system that documents a hiring action. *Id.* ¶ 7. According to Walsh, Hunter's PAR for the battalion chief position was initiated on October 21, 2014 and Torres was marked as "rejected" in NEOGOV on that same day for the battalion chief position. *Id.* ¶ 10 & Exs. A & B. Walsh states that Hunter received final administrative authorization for the promotion on November 2, 2014 and that the promotion went into effect on November 15, 2014. *Id.* ¶¶ 12-13. According to Torres, Chief Reed did not inform him of her decision to promote Hunter until November 6, 2015. Verschagin Decl., Ex. A (Torres Dep.) at 198.

### 5. Torres's Complaint to OEPD

On November 13, 2014,[8] Torres sent a letter to the City Administrator in which he complained that Chief Reed had denied him a promotion to the battalion chief position on the basis of his race. Jefferson Decl., Ex. F. The letter was forwarded to the Equal Opportunity Programs Division ("EOPD") of the City of Oakland in mid-November. McCullough Decl. ¶ 7 & Ex. B (November 17, 2014 letter from EOPD acknowledging receipt of letter). In January 2015, Torres submitted to EOPD a Preliminary Complaint of Discrimination. *Id.* ¶ 11 & Ex. D. He did not schedule an intake interview, however, telling EOPD that he was uncertain as to whether he wanted to proceed. *Id.* ¶ 9. Although EOPD initiated an investigation, it was unable to evaluate Torres's complaint because it needed more specific information from Torres. *Id.* ¶ 14. In

---

[8] Although the letter from Torres carries the date November 14, 2014, it was attached to an email to the City Administrator that was sent on November 13, 2014. Therefore, the Court concludes that the date on the letter was a clerical error.

February 2015, EOPD requested that Torres submit additional information. *Id.* ¶ 13. Although he agreed to the request, he never submitted the requested information. *Id.* Instead, on February 23, 2015 Torres informed EOPD that he had retained counsel and would communicate through his attorney going forward. *Id.* ¶ 15. As EOPD does not conduct investigations through a complainant's attorney, and because it did not have sufficient information to evaluate the complaint, it closed the file at that time. *Id.* ¶ 17.

Chief Reed testified that she was informed by the head of EOPD that Torres had filed a complaint but that "nothing ever came of it." Jefferson Decl., Ex. A (Reed Dep.) at 114.

### 6. The Vacant Deputy Chief Position and Plans to Restructure OFD

In February 2013, deputy chief James Williams retired, leaving one of the two deputy chief positions vacant. Verschagin Decl., Ex. B (Reed Dep.) at 177. Chief Reed did not fill this position until January 2015, when she promoted battalion chief Darin White to the position. *Id.* Chief Reed testified that she saw the vacancy as "a great opportunity" to reorganize OFD's Field Operations Bureau. Jefferson Decl., Ex. A (Reed Dep.) at 64-65. In particular, because the "span of control" within that bureau was "too great," Chief Reed was considering replacing one of the two deputy chief positions with "another layer of command within the operations division" consisting of three assistant chiefs. *Id.* at 64, 67; *see also* Kozak Decl., Ex. B (6-month and 18-month goals including goal of "reduc[ing] span of control within field operations and support services") & Ex. E (department restructure planning meeting notes). Chief Reed testified that in February of 2014 the plans for restructuring the Field Operations Bureau were abandoned when she and the committee realized they were going into a budget cycle and wouldn't be able to "get it done in time." Jefferson Decl., Ex. A (Reed Dep.) at 68-69. At that point, according to Chief Reed, the decision was made to move forward with hiring the deputy chief. *Id.* In August 2014, an exam for the deputy chief position was announced. Walsh Decl. ¶ 16. Interviews for the position were conducted in November 2014. *Id.* Chief Reed selected former battalion chief Darin White in December 2014 and his promotion to the deputy chief position went into effect in January 2015. *Id.*

In the meantime, during the 22 month period when the deputy chief position was vacant,

Local 55 representatives (including vice president Zac Unger) met with Chief Reed every month and urged her to promote a battalion chief to fill the position but Chief Reed "didn't give [them] any reason why she was leaving it unfilled." Verschagin Decl., Ex. C (Unger Dep.) at 10. Union president Daniel Robertson states in his declaration that in monthly meetings with Chief Reed he "implored" her to fill the deputy chief position by promoting a battalion commander. Robertson Decl. ¶ 6. Unger acknowledged that Chief Reed "mentioned reorgs multiple times" but testified that he didn't know what "her various plans were for reorganizing the department." Verschagin Decl., Ex. C (Unger Dep.) at 10. Robertson testified that if Chief Reed was considering doing away with the deputy chief position, he would have expected her to inform the union, which she did not do. Robertson Decl. ¶ 10.

Torres also points to documents he contends contradict Chief Reed's assertion that she was considering eliminating the deputy chief position, citing two official documents from February 2013 in which Chief Reed referred to filling the deputy chief vacancy. *See* Verschagin Decl., Ex. J (February 6, 2013 communication from Chief Reed to all fire staff stating that "[t]he next several months will be a period of transition for Department as we work to fill existing vacancies, as well as vacancies created by the departure of Deputy Chief James Williams"); Torres Decl., Ex. C (executive staff meeting minutes dated February 26, 2013 quoting Chief Reed as stating "Cynthia and I will manage Fire Prevention until we get a new deputy chief").

Unger testified that a "reasonable period" to fill the deputy chief position would be "a couple of weeks" once the process "got started." Verschagin Decl., Ex. C (Unger Dep.) at 34-35. Chief Reed testified that for some promotions, the process can take up to 6 months. Jefferson Decl., Ex. A (Reed Dep.) at 176.

### 7. Chief Reed's Refusal to Extend 2012 Battalion Chief Eligibility List

As of the date when the Eligibility List expired, in November 2014, there were two battalion chief vacancies due to long-term injury that could have been filled with LDA appointments. Usher Decl. ¶ 17. As noted above, at that time Chief Reed was also interviewing battalion chiefs for the deputy chief position, making it likely that there would soon be a permanent battalion chief vacancy. In light of multiple battalion chief vacancies, "the union

suggested to Chief Reed that she request to extend the [Eligibility List] in November 2014." Robertson Decl. ¶ 16. Under the MOU, Chief Reed was entitled to extend the Eligibility List for 120 days. Verschagin Dec., Ex. O. If she had extended the Eligibility List, Chief Reed could have promoted Torres to a battalion chief position. Robertson Decl. ¶ 15. Chief Reed "showed no interest" in extending the Eligibility List, however, and did not do so. *Id.* ¶ 16.

A new battalion chief eligibility list was established in July 2015. Walsh Decl. ¶ 17. Subsequently, six captains were promoted from that list – "a Hispanic man, a Hispanic woman, a White man, an Asian woman and two Black men." *Id.*

## B.  Procedural Background

### 1.  Torres's Claims

In the Complaint, Torres names as Defendants the City of Oakland, OFD and OFD Fire Chief Reed, in her official and individual capacity. He asserted the following claims: 1) Race and National Origin Discrimination under California's Fair Employment and Housing Act ("FEHA"), California Government Code sections 12940(a) *et seq.* (against City of Oakland and OFD) ("Claim One"); 2) Retaliation under FEHA (against City of Oakland and OFD) ("Claim Two"); 3) Failure to Prevent Discrimination under FEHA (against City of Oakland and OFD) ("Claim Three"); 4) Racial Discrimination under 42 U.S.C. §1983 (against Chief Reed) ("Claim Four"); 5) Retaliation under 42 U.S.C. §1983 (against Chief Reed) ("Claim Five"); 6) Racial Discrimination under 42 U.S.C. §1981 (against all Defendants) ("Claim Six"); 7) Retaliation under 42 U.S.C. §1981 (against all Defendants) ("Claim Seven"); and 8) Intentional Infliction of Emotional Distress (against all Defendants) ("Claim Eight").[9]  The Court refers to Claims One, Three, Four and Six, collectively, as the "Discrimination Claims." The Court refers to Claims Two, Five and Seven, collectively, as the "Retaliation Claims."

Torres has agreed to voluntarily dismiss his claim for Intentional Infliction of Emotional Distress. *See* Docket No. 53 at 3 n. 5. Accordingly, the Motion is GRANTED as to that claim,

---

[9]In the Complaint, Torres inadvertently referred to his fifth and sixth claims as "Fifth Cause of Action." In referring to the claims in this Order, the Court has renumbered the claims to correct this error.

which is dismissed with prejudice.   Because they are now moot, the Court does not address Defendants' challenges to Torres's claim for Intentional Infliction of Emotional Distress.

As to the remaining claims, the Court asked Torres to address at oral argument the theory on which each claim is based.  Torres stated that the conduct on which he bases his claims is: 1) the failure to appoint Torres to an LDA battalion chief position in March 2014, when Hunter was appointed to such a position, even though there were several battalion chief vacancies at that time (Discrimination Claims); 2) the promotion of Hunter rather than Torres to the permanent battalion chief position in October/November 2014 (Discrimination and Retaliation Claims); 3) the 22-month delay in filling the deputy chief position, which Torres contends was intended to avoid creating a battalion chief opening before the Eligibility List expired (Discrimination and Retaliation Claims); and 4) Chief Reed's refusal to extend the Eligibility List so that Torres could be selected off of it to fill the vacancy left by the promotion of Darin White to deputy chief (Discrimination and Retaliation Claims).  Torres stipulated that he is not asserting his claims based on the failure to promote him in March 2013, when Bowran and Justice were promoted.  He also stipulated that the protected conduct that is the basis of his Retaliation Claims was the statement he made to Chief Reed in the October 22 Conversation that he believed she had refused to promote him based on race and that he intended to pursue legal remedies (rather than the subsequent complaint he filed with OEPD).

### 2.  Motion

Defendants contend Torres's claims fail on summary judgment because, applying the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981), the City has "several" legitimate non-discriminatory reasons for failing to promote him.  Motion at 9.[10]  In particular, they contend Torres did not "interview as well as other candidates" and that he was "critical of Chief Reed's leadership" during his interview.  *Id*. at 10-11.  Defendants also assert

---

[10] Defendants do not identify the specific claim they are challenging in this section of the Motion. Based on a footnote stating that the standards for FEHA claims are the same as those used for Title VII claims, *see* Motion at 10 n. 2, the Court construes this section of the Motion as challenging Captain Torre's claim for race and national origin discrimination under FEHA.

that their decision not to promote Captain Torres was justified because Chief Reed "conferred with two Oakland Fire Department members who worked with Captain Torres and neither unequivocally supported him." *Id* at 12-13. To prevail on his discrimination claims, Defendants contend, Torres must demonstrate that these reasons are pretextual, and he cannot meet that burden. *Id*. at 13-18.

With respect to pretext, Defendants reject Torres's allegations that Chief Reed intentionally left open a deputy chief position rather than filling it with a battalion chief in order to avoid creating a battalion chief vacancy to which Torres would have been entitled. *Id*. at 13. Defendants point to evidence that Chief Reed was attempting to restructure OFD and that leaving the deputy chief position open gave her flexibility in that regard. *Id*. at 13-15. Further, Defendants contend, there is no city policy or rule, or any Memorandum of Understanding ("MOU") that required Chief Reed to fill this position. *Id*. at 15.

To the extent that Torres scored higher than one of the candidates on the Eligibility List who was promoted to battalion chief (Justice), Defendants argue that there is no policy, rule or MOU that requires hiring from the eligibility list to follow the score ranking; rather, Defendants assert, once candidates are placed on the eligibility list they are all deemed to be equally qualified. *Id*. at 16. Conversely, Defendants contend, Chief Reed's hiring of Captain Hunter in March 2014 for an LDA battalion chief position without re-interviewing the candidates was not evidence of pretext because he was the next person on the eligibility list and it is permissible – though not required – to hire based on ranking on the eligibility list. *Id*. at 16.

Defendants also reject Torres's allegation that statements about race made by Chief Reed in the October 22 Conversation show discriminatory intent. *Id*. at 17-18. As noted above, Defendants assume for the purposes of the Motion only that Chief Reed made the alleged statements that there were "'enough' Hispanics in OFD leadership ranks and the issue was 'unimportant' to her" but contend these statements do not support an inference of discriminatory intent. *Id*. at 17. Rather, Defendants argue, Chief Reed was simply rejecting Torres's suggestion that he should be promoted *because* he was Hispanic. *Id*. Defendants further point to evidence that: 1) Chief Reed made this statement after she had already decided to promote Captain Hunter;

2) Chief Reed had promoted Hispanics before and promoted Hispanics after these alleged statements; and 3) in "most" OFD ranks Hispanics are not underrepresented. *Id*. at 18.

Nor can Torres demonstrate discriminatory intent or a pattern or practice of discrimination based on his "conclusory" allegation that OFD does not have any Hispanics in its leadership ranks, Defendants argue. *Id*. Defendants contend Chief Reed "strives to have a department that reflects the racial diversity in the community it serves" and point to the statistics described above reflecting that the percentage of Hispanics employed by OFD overall between 2012 and 2016 was between 16% and 19% of the Department. *Id*. at 18-19. Defendants acknowledge that the percentage of Hispanics who fill the positions of battalion chief and deputy chief is much lower (they note that currently there are two Hispanic battalion chiefs and no Hispanic deputy chiefs) but argue this lower number does not reflect discrimination but instead, the fact that the number of such positions is "critically limited" under the City's budget. *Id*. at 19. Further, Defendants assert, "[t]he fact that Hispanics do not appear in certain ranks at OFD is of no *legal* significance without detailed information about the pool from which Chief Reed or other OFD chiefs considered candidates." *Id*. at 20 (emphasis in original).

With respect to Torres's claim that Defendants retaliated against him by denying him a promotion after he complained to Chief Reed in the October 22 Conversation, Defendants argue that this claim fails because the evidence shows that the conversation occurred *after* Chief Reed had already made the decision to promote Captain Hunter. *Id*. at 20-21. Furthermore, to the extent Torres may be alleging retaliation based on his November 14, 2014 email to the City Administrator complaining that Chief Reed discriminated against him (which was forwarded to EOPD), Defendants contend Chief Reed was unaware of these complaints until January 2015, after all of the battalion chief positions were filled by other candidates. *Id*. Consequently, there can be no inference of causation, Defendants assert. *Id*.

Defendants also argue that Torres cannot prevail on a claim against the City that it failed to take all reasonable steps to prevent discrimination. *Id*. at 22-23. They contend Torres did not complain to the City until after the promotion process had concluded and the Eligibility List had expired. *Id*. at 22. In any event, they assert, the City followed established procedures for

16

investigating his complaint and any shortcomings were due to Captain Torres's own failure to provide information about his complaint when requested. *Id*. at 23.

Defendants challenge Torres's claim for discrimination under 42 U.S.C. § 1983 on the same grounds they assert his FEHA discrimination claim fails, namely, that Chief Reed had legitimate non-discriminatory reasons for failing to promote him and Torres has not demonstrated any triable issue of material fact that these reasons were pretextual. *Id*. at 23-24. Similarly, Defendants argue, the retaliation claim Torres asserts under 42 U.S.C. § 1983 (assuming he is asserting such a claim under the Fourteenth Amendment) fails for the same reasons the FEHA retaliation claim fails. *Id*. at 24.

Finally, Defendants argue that the claims Torres asserts under 42 U.S.C. § 1981 for discrimination and retaliation are duplicative of his FEHA claims and fail for the same reasons those claims fail. *Id*. at 24-25. Further, because Torres fails to demonstrate any discriminatory or retaliatory animus, Defendants contend Torres can prevail on this claim as to the City only under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978). *Id*. at 25. In particular, Torres must show that Chief Reed's actions were unconstitutional *and* that the City has a custom, policy or practice of discriminating against Hispanics. *Id*. Defendants contend Plaintiff has not offered any evidence to establish liability on that basis. *Id*.

### 3. Opposition

In his Opposition brief, Torres argues there is sufficient evidence of discriminatory intent to survive summary judgment on his claims. Opposition at 20-25, 27. First, he contends the October 22 Conversation constitutes direct evidence of discriminatory intent to which the burden-shifting approach of *McDonnell Douglas* does not apply. *Id*. at 12-13, 21-22 (citing *Goodwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)). He further asserts Defendants cannot rely on evidence that Chief Reed promoted two Hispanics to the position of battalion chief in 2015 to establish that Chief Reed was not motivated by discriminatory intent with respect to her failure to promote Torres because subsequent hiring practices are not relevant. *Id*.

Even apart from this direct evidence, Torres contends there is indirect evidence of discrimination and retaliation under the *McDonnell Douglas* framework because the evidence

17

shows that the legitimate reasons offered by Defendants for failing to promote him are pretextual. *Id*. at 23-25. First, in response to Defendants' assertion that other candidates "interviewed better," Torres points to the testimony of former OFD battalion chief Usher that Torres's interview was "far superior to that of every other candidate." *Id*. at 5, 23. He also points to evidence that he was more experienced than the other candidates on the Eligibility List, having held more specialized positions and led more OFD projects for a greater amount of time than any of the others. *Id*. at 7, 23.

Torres also challenges Defendants' assertion that Chief Reed declined to promote him because he criticized her leadership in the October 10, 2014 interview ("the October 10 interview"). *Id*. at 23. He argues that other panelists, and Chief Reed herself, did not mention any such criticism in their interview notes. *Id*. at 12. He also contends he did not, in fact, criticize Chief Reed's leadership and that he only addressed leadership in the interview in the context of his role as Chair of Chief Reed's Professional Development Program. *Id*.

Torres also rejects Defendants' assertion that one reason for Chief Reed's failure to promote him was Usher's purported failure to unequivocally support him when Chief Reed asked Usher for his opinion. Opposition at 24. Torres argues that in fact, Usher strongly supported him, pointing out that in the Motion, Defendants selectively quote from Usher's text to Chief Reed by leaving out the statement in the text that Usher "still lean[ed] JT [James Torres]." *Id*. at 12 (quoting Reed Decl., Ex. A (Usher Text)). Further, whereas Chief Reed states in her declaration that Usher did not offer his "unequivocal support for Captain Torres," Reed Decl. ¶ 13, Usher states in his own declaration that he expressed strong support for Torres in a conversation he had with Chief Reed before he sent the text quoted above. *Id*. at 12.

According to Torres, Defendants' assertion that Chief Reed left the deputy chief position open to facilitate a restructuring of the Department (rather than to avoid creating a battalion chief opening while Torres was still eligible for promotion) is contradicted by the testimony of union president Robertson and vice president Unger, discussed above. *Id*. at 14-18. Torres contends internal documents also indicate that Chief Reed never intended to eliminate the deputy chief position. *Id*. at 16-18, 24 (citing Torres Decl., Ex. C (February 26, 2013 OFD Executive Staff

18

Meeting minutes quoting Chief Reed as stating that "I will be the interim fire marshal, Cynthia [Perkins] and I will manage Fire Prevention until we get a new deputy chief"); Ex. D (Executive Staff notes stating that "hiring DC" was a 2013-14 goal that had not been completed)).   Torres concedes Chief Reed has discretion to promote or not promote but contends she does not have discretion to refuse to hire based on discrimination or retaliation.  *Id.*

Torres also asserts that there are fact questions that preclude summary judgment as to his Retaliation Claims, which are based on the theory that Chief Reed retaliated against him for telling her in the October 22 Conversation that he believed she had refused to promote him based on his national origin and that he intended to pursue his rights.  *Id.* at 26.   In particular, he contends there are triable issues of fact whether Chief Reed: 1) selected Hunter over Torres for the third permanent battalion chief position  (in October/November 2014); 2) refused to fill the deputy chief position until after the Eligibility List expired; and 3) refused to extend the Eligibility List despite multiple battalion chief openings in retaliation for Torres's protected activity.  *Id.*

Finally, for the same reasons Defendants are not entitled to summary judgment as to Torres's claims for discrimination and retaliation, his claim for failure to prevent discrimination in violation of California law should proceed to trial, Torres contends.  *Id.* at 25-26.

## III.    ANALYSIS

### A.    Legal Standard Under Rule 56 of the Federal Rules of Civil Procedure

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial."  *Id.*  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

**B.    Discrimination Claims (Claims One, Three, Four and Six)**

1.  **Legal Standard**

Torres asserts his Discrimination Claims under California Government Code section 12940 (FEHA), 42 U.S.C. § 1981 and 42 U.S.C. § 1983 (based on alleged violation of the Fourteenth Amendment Equal Protection Clause).  The parties agree that all of these claims stand or fall on whether Torres can establish discriminatory intent on the part of Defendants.  They also agree that as to all of Torres's Discrimination Claims, Torres can survive summary judgment either by: 1) producing direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated OFD; or 2) raising an inference of discriminatory intent under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Metoyer v. Chassman*, 504 F.3d 919, 930–31 (9th Cir. 2007) (42 U.S.C. § 1981 discrimination claims, like discrimination claims asserted under Title VII, 42 U.S.C. § 2000e, require that the plaintiff point to direct evidence of discriminatory intent or raise an inference of discriminatory intent under *McDonnell Douglas* to survive summary judgment); *Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 472 n.14 (9th Cir. 1991) (with respect to intentional discrimination "the status of the § 1983 equal protection claim generally depends on the outcome of the Title VII analysis"); *Guz v. Bechtel National, Inc*. 24 Cal. 4th 317, 354 (2000) (with respect to FEHA claims, "California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination. . . .").

"'With direct evidence, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.'" *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1128 (9th Cir. 2000) (quoting *Blue v. Widnall*, 162 F.3d 541, 546 (9th Cir.1998) (citing *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1220–21 (9th Cir. 1998) (holding that plaintiff is required to produce "very little" direct evidence of the employer's discriminatory intent to move past summary judgment))).

Under the *McDonnell Douglas* framework, the plaintiff first must establish a prima facie case of discrimination.  *Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1155 (9th Cir. 2010). To make a prima facie case of discrimination, a plaintiff must show that: (1) he is a member of a

protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that persons outside his protected class with equal or lesser qualifications, were given more favorable treatment. *Hodge v. Oakland Unified Sch. Dist.*, No. C 09-04719 RS, 2012 WL 1933678, at *4 (N.D. Cal. May 29, 2012), aff'd, 555 F. App'x 726 (9th Cir. 2014); *see also Haney v. United Airlines, Inc.*, No. 15-CV-00474-VC, 2016 WL 80554, at *2 (N.D. Cal. Jan. 7, 2016) ("[A] plaintiff can establish a prima facie case for failure to promote . . . by showing that: '(1) he belongs to a statutorily protected class, (2) he applied for and was qualified for an available [promotion], (3) he was rejected despite his qualifications, and (4) after the rejection, the [promotion] remained available and the employer continued to review applicants possessing comparable qualifications.'" ) (quoting *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973))). "[T]he degree of proof necessary to establish a prima facie case is 'minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994)).

If the plaintiff establishes a prima facie case, the burden of production, but not persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged actions. *Hawn*, 615 F.3d at 1155. If this burden is met, the plaintiff "must then raise a triable issue of material fact as to whether the defendant's proffered reasons for [the challenged conduct] are mere pretext for unlawful discrimination." *Id.* "The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005) (citing *Godwin*, 150 F.3d 1217, 1220–22 (9th Cir.1998)). The employee must offer "'specific, substantial evidence of pretext.'" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir.1994) (quoting *Steckl v. Motorola*, 703 F.2d 392, 393 (9th Cir.1983)). Evidence as to pretext is considered cumulatively. *Chuang v. University of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1129 (9th Cir. 2000).

## 2. Direct Evidence of Discriminatory Intent

Torres contends the October 22 Conversation offers sufficient direct evidence of discriminatory intent to establish a material issue of fact with respect to his Discrimination Claims and therefore that the Court should deny Defendants' request for summary judgment on the basis of that evidence. The Court concludes that even accepting as true Torres's description of the October 22 Conversation, it does not provide direct evidence of discriminatory intent and therefore is not sufficient to demonstrate a triable issue of fact.

"Direct evidence is 'evidence, which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) (quoting *Godwin*, 150 F.3d at 1221 (internal quotation marks omitted)). "'Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer.." *Coghlan v. Am. Seafoods Co*., 413 F.3d 1090, 1095 (9th Cir.2005); *see also Merrick v. Farmers Ins. Grp*., 892 F.2d 1434, 1438 (9th Cir. 1990) ("Comments suggesting that the employer may have considered impermissible factors are clearly relevant to a disparate treatment claim"). These may include explicit statements by decision makers that individuals in a particular protected group will not be considered or are disfavored. *See, e.g., Burns v. Gadsden State Cmty. Coll*., 908 F.2d 1512, 1518 (11th Cir. 1990) (direct evidence of discriminatory intent found based on statement that "no woman would be named to a B scheduled job" where the position for which the female plaintiff had applied was a B schedule job and the author of the statement made the employment decision at issue); *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1221 (9th Cir. 1998), as amended (Aug. 11, 1998) (direct evidence of discriminatory intent found based on statement by one decision maker to another that he "did not want to deal with another female" in the position to which the female plaintiff sought promotion).

The type of conduct and statements that may constitute direct evidence of discriminatory intent is illustrated in *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115 (9th Cir. 2000). In that case, the court found that three pieces of direct evidence were sufficient to demonstrate a triable issue of fact as to discriminatory intent in connection with the failure of

University of California at Davis ("Davis") to promote Dr. Ronald Chuang to a tenured position and the forcible relocation of the research laboratory run by Dr. Ronald Chuang and his wife, Dr. Linda Chuang (who was also a plaintiff in the case). 225 F.3d at 1120. First, a member of the Executive Committee, a decision making body responsible for tenured appointments, stated in a meeting around the time when Dr. Ronald Chuang would have been eligible for a tenured position, that "two Chinks" in the pharmacology department were "more than enough." *Id.* at 1128. Second, another member of the Executive Committee laughed at this comment. *Id.* ("For purposes of summary judgment, Dean Williams's laughing response to this remark establishes adequate evidence of discriminatory intent on his part also"). Third, during the relocation of the research laboratory the chairman of the pharmacology department, Dr. Hollinger, told the Chuangs that they "should pray to [their] Buddha for help." *Id.* at 1129.

The Ninth Circuit found that the district court in *Chuang* had erred in finding that the second comment did not constitute direct evidence of discriminatory animus because it was "apparently intended as a humorous comment on his and Dr. Chuang's joint plight in the laboratory relocation controversy in which Dr. Hollinger was Dr. Chuang's ally in opposing the move." *Id.* The Court of Appeals explained, "the comment was not humorous" and moreover, the district court erroneously drew an inference in favor of the defendants when it concluded that Dr. Hollinger shared the plight of the plaintiffs, which the record did not support. *Id.* The Court of Appeals cautioned, "[i]t is not the province of a court to spin such evidence in an employer's favor when evaluating its motion for summary judgment. To the contrary, all inferences must be drawn in favor of the non-moving party." *Id.*

The court in *Chuang* found that the direct evidence of discriminatory intent discussed above, considered cumulatively with indirect evidence, was sufficient to establish a triable issue of fact as to the plaintiffs' discrimination claims. *Id.* The indirect evidence was considered under the *McDonnell Douglas* framework. *Id.* at 1127-28. As to the failure to promote Dr. Ronald Chuang, the court found that the evidence of his "extraordinary" qualifications and reputation, in combination with the fact that he was the "only full-time faculty member in his department" who had not received a tenured position and "the only non-Caucasian" was sufficient to make a strong

prima facie case of discrimination. *Id.* at 1127. Further, in the face of the defendant's proffered reason for denying Dr. Chuang a tenured position – that he was not qualified and his non-tenured position was never in jeopardy – this evidence was sufficient to demonstrate that the defendant's explanations for not offering him a tenured position were pretextual. *Id.* The court stated, "[h]e was promised [a tenured position], but whenever one became available, it was assigned to someone else. Given this evidence, a factfinder could well decide to disbelieve Davis's explanation . . . ." *Id.*

On the other hand, the Ninth Circuit has held that some remarks are not sufficient to show discriminatory intent for the purposes of a discrimination claim based on failure to promote. In *Merrick*, for example, the plaintiff alleged that he had been denied a promotion because of his age and pointed to a comment by his employer that the younger man who was given the position was "a bright, intelligent, knowledgeable young man" to establish discriminatory intent. 892 F.2d at 1438-39. The Ninth Circuit held that the comment was a "stray remark" that was not sufficient to establish a triable issue of fact as to discriminatory intent. *Id.* The court in *Merrick* also found that the plaintiff had not demonstrated a triable issue of fact under *McDonnell Douglas*, concluding that there was no evidence that controverted the reasons offered by the employer for promoting another individual over the plaintiff. *Id.* at 1437-1438. In particular, the employer justified its decision on the basis that the plaintiff "did not command the respect necessary for that position, and did not maintain the positive demeanor necessary" and that the other candidate had been recommended by the supervisor of the two people who made the hiring decision that was challenged. *Id.* at 1437. While the plaintiff pointed to evidence that his qualifications were superior to those of the individual who was promoted, the court concluded that he had offered no evidence to refute the testimony of one of the two decision makers "that Merrick lacked the professionalism and the attitude required for the . . . position." *Id.* at 1438.

In *Nesbit v. Pepsico, Inc.*, the plaintiff alleged he was laid off on the basis of his age and as evidence of discriminatory intent pointed to a supervisor's comment that "[w]e don't necessarily like grey hair," and the statement of a senior vice president of personnel that "[w]e don't want unpromotable fifty-year olds around." 994 F.2d 703, 705 (9th Cir.1993). The court found that

these were "more than the stray remark involved in *Merrick*" but nevertheless concluded the remarks were insufficient to create a triable issue of fact because they were not "tied directly" to the plaintiff's termination. *Id*.

Here, the statements by Chief Reed regarding the presence of Hispanics in the upper echelons of OFD were made in a conversation in which Torres was specifically asking Chief Reed why she decided not to promote him to a battalion chief position. Consequently, her comments were not unrelated to the decision not to terminate Torres, in contrast to *Nesbit*. The more difficult question is whether the comments – drawing all reasonable inferences in favor of Torres – show that Chief Reed may have considered an impermissible factor in declining to promote Torres to a battalion chief position, namely, the fact that he is Hispanic. The Court concludes that they do not.

In contrast to all of the cases discussed above, Chief Reed stated that it was "unimportant" to her promotion decision that Torres is Hispanic. Even drawing all reasonable inferences in favor Torres, this statement supports an inference that she did *not* consider his race in deciding whether to promote him, not that she declined to promote him *because* of his race. Further, while the statement that OFD has "enough" Hispanics bears some superficial similarity to the statement in *Chuang* that "two Chinks" in the pharmacology department were "more than enough," in the latter case the inference of bias arose in large part the use of the word "more" and the derogatory reference to "Chinks." At best, Chief Reed's statements show that the concerns that she expressed to Torres about promoting him to the battalion chief position (which were not related to his race) were not outweighed by the fact that Torres is Hispanic (which Torres argued should weigh *in favor* of his appointment to the battalion chief position). The Court finds no authority suggesting that such a statement is sufficient to show discriminatory animus. Rather, the facts here are similar to those in *Merrick* to the extent that the nature of the statement at issue is insufficient to show bias. Therefore, the Court concludes that the October 22 Conversation is not sufficient evidence of discriminatory intent to defeat Defendants' summary judgment motion.

### 3. Evidence of Discriminatory Intent Under *McDonnell Douglas*

While the Court finds that Torres's reliance on the October 22 Conversation as direct

evidence of discriminatory intent is misplaced, it concludes that Torres's Discrimination Claims survive summary judgment under *McDonnell Douglas,* at least as to some of the theories Torres advances as to these claims.

As a preliminary matter, the Court addresses the conduct Torres contends constituted adverse employment actions for the purposes of his Discrimination Claims. As discussed above, at oral argument Torres identified four types of conduct on which he bases these claims: 1) Defendants' failure to promote him to an LDA position in March 2014; 2) Defendants' failure to appoint him to the permanent battalion chief position in October/November 2014; 3) Defendants' delay in filling the deputy chief position; and 4) Defendants' refusal to extend the 2012 Eligibility List. The Court concludes that only the first two acts are adverse employment actions that may give rise to a cognizable employment discrimination claim.

It is well-established that a failure to hire or promote may be an adverse employment action. *See Hodge v. Oakland Unified Sch. Dist.*, No. C 09-04719 RS, 2012 WL 1933678, at *5 (N.D. Cal. May 29, 2012), aff'd, 555 F. App'x 726 (9th Cir. 2014) ("Failure to hire is undoubtedly an adverse employment action [under] *McDonnell Douglas*"); *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115 (9th Cir. 2000) (finding triable issue of fact on employment discrimination claim based on failure to promote). On the other hand, the Court finds no authority that suggests that Defendants' delay in appointing a deputy chief or their failure to extend the Eligibility List are adverse employment actions that are sufficient to support a discrimination claim.

The term "adverse employment action" "has become a familiar shorthand expression referring to the kind, nature, or degree of adverse action against an employee that will support a cause of action under a relevant provision of an employment discrimination statute." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1049 (2005). Under FEHA and Title VII, an adverse employment action "must materially affect the terms, conditions, or privileges of employment to be actionable . . . ." *Id.* at 1052. As the parties agree that Torres's discrimination and retaliation claims are governed by Title VII standards, the Court applies the same requirement to Torres's claims asserted under 42 U.S.C. §§ 1981 and 1983. Torres has not shown that Defendants' delay

26

in hiring a deputy chief or their refusal to extend the Eligibility List affected the terms, conditions or privileges of Torres's employment. To the contrary, these actions had no direct impact on Torres. While they may have been indirectly related to Defendants' failure to promote Torres in the sense that Defendants *could* have promoted Torres to a battalion chief position if they had hired a deputy chief sooner or extended the Eligibility List, the Court can only speculate as to whether Defendants would, in fact, have done so. Therefore, the Court concludes that this conduct did not have the sort of direct impact on the terms, conditions or privileges of Torres's employment that is required to constitute an adverse employment action. Below, the Court conducts the *McDonnell Douglas* analysis as to Torres's two remaining theories, that is, that Defendants failed to promote him in March 2014 and again in the fall of 2014 because he is Hispanic.

With respect to the LDA battalion chief position in March 2014, Torres has established a prima facie case of discrimination. In particular, he has presented evidence that: 1) he is Hispanic and therefore is a member of a protected class; 2) there were multiple temporary battalion chief openings that he was qualified for and to which he could have been appointed from the Eligibility List; 3) Defendants did not appoint Torres to fill a temporary battalion chief vacancy; and 4) Defendants treated the only other individual on the Eligibility List (Hunter), who is not Hispanic, more favorably by appointing him to one of the open battalion chief positions.

In response, Defendants contend Chief Reed appointed Hunter to an LDA position rather than Torres because Hunter's rank on the Eligibility List was higher than Torres's. Defendants fail to offer any explanation, however, as to why Chief Reed decided that it was not necessary to fill one of the two *other* battalion chief vacancies by offering Torres an LDA battalion chief position. Further, Torres has introduced evidence that the union had recommended that *both* Hunter and Torres be promoted to fill a battalion chief position in the spring of 2014 and that by leaving battalion chief positions unfilled Chief Reed was actually threatening public safety. The Court therefore concludes that Defendants have failed to articulate a legitimate non-discriminatory reason for failing to promote Torres to one of the vacant battalion chief positions in the Spring of 2014. Because Torres has raised an inference of discriminatory intent by making a prima facie

case, that claim therefore survives summary judgment.

Similarly, the Court concludes that Torres has raised an inference of discriminatory intent as to Defendants' failure to promote him to the permanent battalion chief position in October/November 2014. There is no question that Torres has made a prima facie case for this conduct for the same reasons he made a prima facie case as to Defendants' failure to promote him in March 2014. He has also demonstrated that there are material disputes of fact as to pretext. Defendants offer two explanations for Chief Reed's decision to promote Hunter over Torres in the Fall of 2014: 1) she felt that Torres was criticizing her leadership in the October 10 interview; and 2) the two individuals she spoke to about Torres in connection with the promotion decision, Simmons and Usher, did not offer their "unequivocal support" for Torres's promotion to battalion chief. As to each of these reasons, Torres has pointed to evidence from which a jury might reasonably infer that these explanations are not credible.

With respect to Torres's alleged criticism of Chief Reed's leadership in the October 10 interview, there is no question that if Chief Reed subjectively believed that Torres was criticizing her leadership, it was within her discretion to reject him for the battalion chief position on that basis. *Hicks v. KNTV Television, Inc.*, 160 Cal. App. 4th 994, 1005 (2008) ("there is nothing inherently suspect in the use of subjective criteria" and the fact that a hiring decision "was based upon subjective criteria does not, by itself, demonstrate pretext"). On the other hand, "subjective evaluations may lend themselves to discriminatory abuse and should, therefore, be closely scrutinized." *Id.* Torres has offered two types of evidence that could lead the jury to conclude that Chief Reed did not, in fact, base her decision on his criticism of her leadership in his interview: 1) his own testimony that during the interview he spoke only of his own leadership skills and never challenged Chief Reed's leadership; and 2) interview notes that he contends support his account of what was said during the interview. The Court has closely reviewed the interview notes and agrees with Torres that when all reasonable inferences are drawn in favor of Torres, there is nothing in them that suggests that he criticized Chief Reed's leadership.

The Court notes that in their Reply brief and at oral argument Defendants invited the Court to draw an inference in their favor in interpreting the notes from the October 10 interview. In

particular, Defendants argued that the notes indicated that Torres had specifically referenced the desire for leadership in the Chief of OFD, apparently relying on the following notation: "Talks of people, members, crews – asks what they want in a chief. 'They want leadership.' . . .They want BC's they can believe in." Reply at 6 (citing Kozak Decl., Ex. N, OCA 2681). At best, this statement is ambiguous as to whether Torres might have been talking about the OFD Chief, or Chief Reed specifically. Drawing all reasonable inferences in favor of Torres, as the Court is required to do on summary judgment, and reading the notation in context of the notes as a whole, a jury could (and likely would) conclude that Torres was discussing the *battalion* chief position rather than chief of OFD. Because Defendants' characterization of the evidence requires the Court to draw an impermissible inference in their favor, this argument must fail at this stage of the case.

The Court also finds that there are material disputes of fact as to Defendants' reliance on Usher's failure to unequivocally support Torres in his communications with Chief Reed. Again, Defendants ask the Court to draw inferences in their favor by focusing on certain language in a single text from Usher to Chief Reed while ignoring the portion of the text that states that Usher "still lean[s] JT." They also ignore Usher's declaration and testimony that he had had a previous conversation in which he told Chief Reed unequivocally that he supported Torres and listed specific reasons why Torres was the stronger candidate for the battalion chief position. In light of this evidence, a jury might reasonably conclude that Chief Reed's reliance on Usher's failure to unequivocally support Torres is not credible. In particular, the jury could conclude that Chief Reed understood that Usher strongly supported the appointment of Torres and that Usher's advice to "sit on" the decision and his statement that Chief Reed had a "tough" choice that would depend on "what [she] need[ed] on the street" was merely an acknowledgement that Hunter was also qualified for the position and that it was ultimately Chief Reed's call as to what particular skills and qualifications she believed would be most important in the successful candidate.

For these reasons, the Court concludes that Torres has established that there is a triable issue of fact as to whether he was denied the promotion to the battalion chief position in the Spring of 2014 and then again in October/November 2014 on the basis of his national origin. To the extent his discrimination claims are based on those two adverse employment actions, the

claims survive summary judgment.  To the extent they are based on Defendants' delay in hiring a deputy chief and the refusal to extend the Eligibility List, the Court grants summary judgment on Torres's discrimination claims.[11]

### C.  Retaliation Claims (Claims Two, Five and Seven)

#### 1.  Legal Standard

"To assert a prima facie retaliation claim under FEHA, 'the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action.'"  *Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859, 868 (9th Cir. 1996), as amended on denial of reh'g (Apr. 22, 1996), as amended on denial of reh'g (June 3, 1996) (quoting *Flait v. North American Watch Corp.*, 3 Cal. App. 4th 467, 476 (1992)).  Once a prima facie case has been established, the burden shifts to the employer to present legitimate reasons for the adverse employment action.  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.2000).  If the employer does so, the burden shifts back to plaintiff to demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext.  *Id.* (citing *Flait*, 3 Cal. App. 4th at 476).

#### 2.  Discussion

As discussed above, the delay in hiring a deputy chief and the refusal to extend the Eligibility List are not cognizable adverse employment actions.  Thus, to the extent Torres bases his Retaliation Claims on this conduct, Defendants are entitled to summary judgment on those claims. The remaining conduct Torres points to as the basis for his Retaliation Claims is the failure to promote in October/November 2014.  As to that claim, the Court concludes that there are triable

---

[11] Defendants argue in the Motion that there is no personal liability as to Chief Reed on the 42 U.S.C. § 1981 claim.  *See* Motion at 24 (citing *Bruin v. Mills Coll.*, No. C 06-05209 WHA, 2007 WL 419783, at *3 (N.D. Cal. Feb. 6, 2007);  *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 850 (9th Cir. 2004)).  Neither case cited by Defendants holds that there is no individual liability under § 1981, however.  Indeed, in the *Bruin* case Judge Alsup holds just the opposite, stating that while the Ninth Circuit "has not directly addressed the issue of whether an employee may bring a Section 1981 discrimination claim against individual supervisory employees . . . . [t]he vast majority (if not all) of other circuits sustain such claims."  He went on to "follow the clear weight of authority in recognizing individual liability under Section 1981."  *Id.* Therefore, the Court rejects this argument.

issues of fact that preclude summary judgment.

As to the failure to promote in October/November 2014, the question is whether Defendants' promotion of Hunter rather than Torres to the permanent battalion chief position was in retaliation for the statements Torres made to Chief Reed in the October 22 Conversation. Defendants contend there can be no causation because Chief Reed had already decided to promote Hunter by October 17, 2014 and had requested approval of the appointment on October 20, 2014. Torres, however, offers conflicting evidence as to whether Chief Reed had made a final decision by October 22. In particular, Torres testified that Chief Reed *told* him at the end of the October 22 Conversation that she had not made up her mind, and he offers his contemporaneous notes of the conversation in support of his account. The evidence also shows that Hunter's promotion was not administratively authorized and did not become effective until November 2014. Drawing all reasonable inferences in favor of Torres, the Court finds that a jury could reasonably conclude that Chief Reed had not ruled out the possibility of offering the battalion chief position to Torres as of October 22, 2014 but ultimately decided not to do so in retaliation for the statements he made in the October 22 Conversation.

The Court therefore concludes that Torres's Retaliation Claims survive summary judgment to the extent they are based on the theory that he was denied the promotion to permanent battalion chief in October/November 2014 in retaliation for statements he made in the October 22 Conversation.

## IV. CONCLUSION

For the reasons stated above, the Motion is GRANTED in part and DENIED in part. In particular, with respect to Claims One, Three, Four and Six (the Discrimination Claims), the Court finds that Torres has established that there is a triable issue of fact as to: 1) whether Torres was denied a promotion to battalion chief (for Limited Duration Appointment) in the Spring of 2014 on the basis of his national origin; and 2) whether Torres was denied a promotion to battalion chief in October/ November 2014 ( for a permanent appointment) on the basis of his national origin. To the extent the Discrimination Claims are based on those two adverse employment actions, the claims survive summary judgment. To the extent the Discrimination Claims are based on

Defendants' delay in hiring a deputy chief and refusal to extend the Eligibility List, the Court grants summary judgment on those claims. With respect to Claims Two, Five and Seven (the Retaliation Claims), Torres's claims survive summary judgment to the extent they are based on the theory that he was denied the promotion to permanent battalion chief in October/November 2014 in retaliation for statements he made in the October 22 Conversation. To the extent the claims are based on any other theories, Defendants are entitled to summary judgment on Torres's Retaliation Claims.

**IT IS SO ORDERED.**

Dated:   September 12, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge